UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MERAKI RECOVERY HOUSING, LLC; CHAD MOEN; SCOTT BESTLER; and LELAND DUNN, | Case No. 20-CV-0203 (PJS/KMM) |
| Plaintiffs, | ORDER |
| v. | |
| CITY OF COON RAPIDS, MINNESOTA, | |
| Defendant. | |

Scott A. Benson, BRIOL & BENSON, PLLC; Fabian S. Hoffner, THE HOFFNER FIRM; Steven G. Polin, LAW OFFICES OF STEVEN G. POLIN, for plaintiffs.

Jessica E. Schwie and Michelle A. Christy, KENNEDY & GRAVEN, for defendant.

Plaintiff Meraki Recovery Housing, LLC ("Meraki") owns and operates a sober-living home in Coon Rapids, Minnesota. Plaintiffs Chad Moen, Scott Bestler, and Leland Dunn are recovering alcoholics who live in the home. In early 2019, Meraki asked defendant City of Coon Rapids ("the City") to exempt the sober home from an ordinance that limits the number of unrelated persons who can live together in a single-family house in a residential district. Following a public meeting, the Coon Rapids City Council ("City Council") denied Meraki's request to permit ten people to live in the sober home rather than the six allowed under the ordinance.

Plaintiffs now bring claims against the City pursuant to the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[1]  Both sides have moved for summary judgment.  For the reasons that follow, the Court grants the City's motion and denies plaintiffs'.

## I.  BACKGROUND

In the fall of 2018, Grant and Krista Johnson purchased a single-family home in Coon Rapids, Minnesota, intending to operate the home through Meraki (their LLC) as a sober home for recovering substance abusers.[2]  ECF No. 32-1 at 46–48; ECF No. 32-3 at 12–13.  The sober home is located in a low-density residential district ("LDR-2").  ECF No. 32-3 at 83.  Only single-family detached dwellings are permitted in LDR-2 districts,[3] ECF No. 32-1 at 549, and "family" is defined by the City to include *either*: (1) an unlimited number of persons "related by blood, marriage, or adoption . . . living

---

[1]In their complaint, plaintiffs also refer to the Due Process Clause of the Fourteenth Amendment.  ECF No. 1 ¶ 19.  However, the complaint contains only two counts for relief: discrimination under the FHA and discrimination under the ADA. The complaint does not adequately plead a due-process claim.

[2]Meraki "provides affordable housing and support to individuals with disabilities including those who are recovering from substance abuse and/or alcoholism."  *Id.* ¶ 5.

[3]"Two-family dwellings approved by the City prior to January 1, 2005" are also permitted in LDR-2 districts but such dwellings are irrelevant to this case.

together as a single housekeeping unit" *or* (2) "[a] group of not more than six

[unrelated] persons . . . living together as a single housekeeping unit." *Id.* at 515.

On January 29, 2019, Meraki asked the City for an exception to its zoning

ordinance so that ten residents could live in the sober home. (The residents of the sober

home are unrelated, so the six-person limit applies.) Meraki framed its request as a

request for a reasonable accommodation of the residents' disabilities—those disabilities

being "alcoholism or chemical dependence." *Id.* at 47–51. Meraki explained that

"allow[ing] larger numbers of individuals to live together as a family . . . is beneficial in

creating a therapeutic environment, and also to allow the program to sustain itself

financially." *Id.* at 49.

On March 19, 2019, the City Attorney (David Brodie) informed Meraki that the

City was "developing a process to handle requests like your[s]." *Id.* at 95. Brodie later

proposed—and the City Council later adopted—a reasonable-accommodation

ordinance.[4] *Id.* at 375, 391–92.

_____

[4]In pertinent part, the ordinance provides that reasonable-accommodation requests will be evaluated by the City based on the following factors: "(a) whether there is a qualifying disability; (b) whether the request is needed to allow a disabled person equal opportunity to use and enjoy a dwelling or to live in a particular neighborhood as a person without disabilities; (c) whether the request is reasonable considering its potential impact on surrounding uses, the extent to which the accommodation meets the stated need, and other alternatives that may meet that need; (d) the number, nature, and extent of the requested accommodation in relation to the physical limitations of the building and site; (e) whether the request would constitute a fundamental alternation

(continued...)

On July 29, 2019, Meraki resubmitted its request for a reasonable accommodation, this time following the procedure set forth in the new ordinance. *Id.* at 394–431. On August 12, 2019, the City asked for a floor plan of the sober home, additional information related to parking, and information about the mix of residents. Meraki responded on August 30 and September 5, 2019. *Id.* at 433–39. The City Council put Meraki's request on the agenda for its October 15, 2019 meeting.

In anticipation of that meeting, several residents wrote to the City expressing opposition to Meraki's request. *See id.* at 443–48, 453. These residents primarily raised concerns about safety,[5] parking,[6] and traffic.[7] The City Planner (Scott Harlicker) also prepared a memorandum in which he recommended that the City Council deny

---

[4](...continued)
[*sic*] of the City's regulations, policies, or procedures; (f) whether the request would impose an undue financial or administrative burden on the City; and (g) any other factor that may have a bearing on the request." ECF No. 32-1 at 391–92.

[5]*E.g. id.* at 444–45 ("40-60% of addicts relapse. By increasing the number of occupants, you are also increasing the risks. What happens when a resident relapses? Will there be drugs across the street from my 5 year old and my newborn daughter? Will there be angry outbursts and potential for violence? Will they resort to their old habits in which us neighbors should be afraid. . . . My family and I don't want to feel unsafe in our home again. Please vote against this. "); *id.* at 453 ("Let's not roll the dice that 1 of the up to 20 men/year will statistically relapse and harm someone in our neighborhood.").

[6]*See id.* at 444, 447.

[7]*See id.* at 444, 447, 453.

-4-

Meraki's request. *Id.* at 449–52. The primary reasons that Harlicker gave for his recommendation were that "[t]he request does not show the extent of the accommodation meets the stated need" and "[t]he request is not reasonable considering the potential impact on surrounding uses." *Id.* at 451. Harlicker also expressed concern about the number of residents in bedrooms, the number of bathrooms, and kitchen use. *Id.*

At the City Council meeting on October 15, Meraki's attorney (Fabian Hoffner) and owner (Krista Johnson) made presentations and answered questions from councilmembers. *Id.* at 475–79, 483–85. For the first time since applying for the accommodation, Johnson disclosed to the City Council that ten residents were already living at the sober home, in violation of the zoning ordinance. *Id.* at 477. She also explained, based on her experience running sober homes, why she believed that having ten residents in the sober home was necessary, citing a better community environment and financial viability. *Id.* at 478, 484. Councilmember Brad Johnson asked whether Meraki had "any learned treatises[ or] peer review articles that say ten is better than six?" *Id.* at 479. In response, Hoffner referred to judicial decisions that purportedly found that "10 to 15" is the ideal number of residents in a sober home. *Id.* Two Meraki residents also addressed the City Council and described how they had benefitted from living in sober housing. *Id.* at 482, 485.

-5-

Several community members spoke in opposition to Meraki's request. Some of those speakers had previously written to the City, and others had not. The residents primarily reiterated the concerns regarding safety, parking, and traffic that had been raised prior to the meeting. *Id.* at 479–83, 485–87. In response to the concerns expressed about safety, City Attorney Brodie clarified that there had been only two relatively trivial police contacts at the sober home since Meraki began operating it. *Id.* at 487.

After closing the meeting to the public, several councilmembers voiced their own opinions about Meraki's request. Councilmember Demmer emphasized the scope of the Council's decision:

> [S]o to be very clear, this is not saying anything about letting sober housing in or not letting sober housing in. We'll not make rules that don't allow sober housing. That is not allowed. That's not okay. What this is, is something that says is ten reasonable based on our prescribed limit of six.

*Id.* Demmer then explained to the rest of the Council that he had done some independent research to determine whether "there [is] a magic number around ten" and was unable to find any evidence supporting Meraki's assertion. *Id.* at 488. Based on this lack of evidence, he expressed agreement with Harlicker's recommendation to deny Meraki's request. *Id.*

Councilmember Geisler also agreed with the recommendation to deny the request, prefacing her opinion by stating:

> For me, this one was difficult, in that I believe we need sober
> houses.  I believe that we need to give people second
> chances. . . . [F]or me, having a sober house in a
> neighborhood is not a bad thing.  I think it's good to have
> people that will integrate into the neighborhood and
> whatnot.  There also then gets to be the point where you
> start looking at the impact and we have general city codes
> and it has nothing to do with if it's a sober house.

*Id.*

Finally, Councilmember Johnson expressed agreement with the others,

explaining that he believed "that some of the benefits that are being advanced are a little

too conjectural" so he was "not persuaded that ten is a tangible benefit over six in this

house under these specific circumstances."  *Id.* at 489.  But he also expressed concern

about what would happen to the ten residents who were already living at the sober

home if the Council denied Meraki's request.  He requested "a plan to be put in place

by City staff where [the residents] are allowed kind of the grace to find an appropriate

way to move out without maybe being backfilled."  *Id.* at 490.

The Council then voted unanimously to deny Meraki's request.  *Id.*  Two weeks

later, the City asked Meraki to submit "a written timeline/plan by November 15, 2019

for bringing the property into compliance" with the City Code and informed Meraki

that its rental license would not be renewed if it did not come into compliance.  *Id.* at

505.  Meraki filed this lawsuit on January 14, 2020.  ECF No. 1.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

At summary judgment, the non-movant bears an affirmative burden "to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" *Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992) (quoting *Robinson v. Monaghan*, 864 F.2d 622, 624 (8th Cir. 1989)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### B. Statutory Framework

The FHA and the ADA both prohibit municipalities from discriminating on the basis of disability. Under the FHA, it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of

-8-

a handicap."  42 U.S.C. § 3604(f)(1).  And pursuant to the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."  42 U.S.C. § 12132.  These statutory provisions apply to municipal zoning ordinances.  *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539 (2015) ("These unlawful practices [under the FHA] include zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification."); *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1157 (9th Cir. 2013) ("[Z]oning practices that discriminate against disabled individuals can be discriminatory, and therefore violate [the FHA], if they contribute to making unavailable or denying housing to those persons. . . . Like the FHA, [the ADA] prohibits governmental entities from discriminating against disabled persons through zoning." (quotations and alterations omitted)); *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574 (2d Cir. 2003), *superseded by regulation on other grounds* (concluding that both the ADA and FHA "apply to municipal zoning decisions").

Due to the substantial similarities between the FHA and the ADA, the Court will address them together.  *See One Love Hous., LLC v. City of Anoka*, No. 19-CV-1252 (JRT/DTS), 2021 WL 3774567, at *9 (D. Minn. Aug. 25, 2021); *accord Tsombanidis*, 352 F.3d

at 573 n.4; *Pac. Shores Props.*, 730 F.3d at 1157.  A plaintiff bringing a discrimination

claim under either the FHA or the ADA may proceed under any of three theories:

(1) disparate treatment (also referred to as intentional discrimination); (2) disparate

impact; or (3) failure to make a reasonable accommodation.  *Tsombanidis*, 352 F.3d at

573; *One Love*, 2021 WL 3774567, at *9.  Plaintiffs advance all three theories in this case.[8]

———————————

[8]In order to succeed under any of these theories, plaintiffs must establish that they are, in fact, disabled (or "handicapped") within the meaning of the relevant statutes.  *See* 42 U.S.C. § 3604(f)(1) (prohibiting discrimination "because of a handicap"); 42 U.S.C. § 12132 (prohibiting discrimination against "qualified individual[s] with a disability").  In their complaint, plaintiffs allege that they are disabled "by virtue of their alcohol or chemical dependency combined with their completion of a substance abuse treatment program."  ECF No. 1 ¶ 22.  The City did not dispute that plaintiffs were disabled until it filed its summary-judgment motion.  In its memorandum in support of that motion, the City argues that the plaintiffs do not have standing because they are not disabled.  *Compare* ECF No. 34 at 12 *with* ECF No. 32-1 at 450 (Harlicker memorandum to City Council, concluding that plaintiffs are disabled); ECF No. 36 at 14 (Councilmember Demmer acknowledging that recovering substance-abusers are disabled).

The Court does not view the question of whether plaintiffs are disabled as a question of standing—that is, as a question of whether this Court has Article III power to adjudicate plaintiffs' claims.  Rather, disability is simply one of several elements that plaintiffs must establish to recover under the statutes.  As this Court explained in another discrimination case:

> . . . Ridgewater has confused the question whether a plaintiff has standing with the question whether the plaintiff has a winning case.  Standing "in no way depends upon the merits of the plaintiff's contention that particular conduct is illegal. . . ."  *Warth v. Seldin*, 422 U.S. 490, 500 (1975). A contrary rule would mean that every plaintiff who *loses*—even plaintiffs who lose after a jury trial—would not

(continued...)

### C.  Disparate Treatment

The "key element" of a disparate-treatment claim is "discriminatory intent."

*Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004); *see also Gallagher v. Magner*, 619 F.3d

823, 831 (8th Cir. 2010) ("Proof of discriminatory purpose is crucial for a disparate

treatment claim.").  Determining whether a municipality's zoning decision was tainted

by discriminatory intent "demands a sensitive inquiry into such circumstantial and

---

[8](...continued)

> have Article III standing.  That obviously is not the law.  In
> pleading that Ridgewater failed to hire him due to his age,
> Salerno has alleged injury-in-fact, causation, and
> redressability, which is sufficient to give him standing.

*Salerno v. Ridgewater Coll.*, No. 06-CV-1717 (PJS/RLE), 2008 WL 509001, at *4 (D. Minn. Feb. 8, 2008).  In short, if plaintiffs cannot establish that they are disabled—just as if plaintiffs cannot establish that they have suffered discrimination—their claims will be dismissed on the merits, not for lack of standing.  *See City of St. Louis v. Dep't of Transp.*, 936 F.2d 1528, 1532 (8th Cir. 1991) ("[I]n the context of standing, it is the nonfrivolous claims of a party that are determinative, not whether the party can sustain those claims by proof on the merits.").

It is clear that plaintiffs are at least "impaired," *see Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 (2d Cir. 2002) ("Alcoholism, like drug addiction, is an 'impairment' under the definitions of a disability set forth in the FHA, the ADA, and the Rehabilitation Act."), *superseded by statute on other grounds*, but whether their impairment rises to the level of disability is not clear from the record.  *See Scheffler v. Dohman*, 785 F.3d 1260, 1261 (8th Cir. 2015) ("This court has previously recognized that alcoholism may qualify for disability under the ADA *when it limits a major life activity*." (emphasis added)).  For that reason alone, the Court cannot grant summary judgment to plaintiffs.  The Court can, however, grant summary judgment to the City if it is clear that plaintiffs cannot recover even if they are disabled.

direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

The City, of course, denies that it acted with anti-disability animus when it turned down Meraki's request. The councilmembers testified that they denied Meraki's request because Meraki had not adequately explained why the sober home needed ten residents to provide adequate therapeutic benefits and because ten residents seemed incompatible with the sober home's physical layout and the nature of the surrounding neighborhood. *E.g.* ECF No. 32-3 at 169 (Councilmember Greskowiak's testimony); *id.* at 185–86 (Councilmember Kiecker's testimony); ECF No. 32-4 at 27–28 (Councilmember Geisler's testimony); ECF No. 36 at 81–82, 88–89 (Councilmember Wells's testimony). If, in fact, these were the reasons for the City's decision, then the City's decision was not unlawful.

For their part, plaintiffs have not offered any direct evidence of discriminatory intent. Moreover, as the Court explained at oral argument, plaintiffs have no indirect evidence in the form of "comparators" who were treated more favorably by the City—such as evidence of a group of unrelated residents who were not disabled and who were given an exemption from the six-resident limitation. Plaintiffs nevertheless argue that other indirect evidence shows that the City's denial of plaintiffs' request was motivated by discriminatory intent: (1) the only other sober home in the City was "shut

down by Coon Rapids in 2014"; (2) the City departed from its usual procedures to create a reasonable-accommodation process in response to Meraki's initial request; and (3) several community members expressed hostility to the sober home before the City Council voted to deny Meraki's request.  ECF No. 40 at 30–31.[9]

Even when viewed in the light most favorable to plaintiffs, this evidence would not permit a reasonable jury to find that the City was motivated by animus toward the disabled:

*First*, the record is clear that the City's decision not to renew the rental license of another sober home in 2014 was unrelated to the fact that some of its residents may have been disabled.  Documentary evidence submitted by the City—as well as the testimony of City Planner Harlicker—establish beyond reasonable dispute that the City did not renew the rental license of the sober home because the sober home did not comply with either the City Code (the sober home racked up 44 violations) or the terms of its rental license.  *See* ECF No. 32-4 at 377–461; ECF No. 32-3 at 100–01.  What is most notable about the prior sober home is the fact that the City allowed it to operate for

_____

[9]Plaintiffs argue that the sober home will not be able to operate unless it is given an exception from the zoning ordinance.  However, the effect of the City's decision on the sober home does not show discriminatory intent absent "a clear pattern, unexplainable on grounds other than [disability]."  *Arlington Heights*, 429 U.S. at 266.  There is no such "pattern" in this case.  The City's decision affects only the plaintiffs in this case, and plaintiffs have offered no evidence that the City has even considered—let alone denied—requests for exceptions to the zoning ordinances from other groups of disabled residents.

more than 15 years, *see* ECF No. 32-3 at 100, which suggests that neither the City's

decision not to renew the sober home's license in 2014, nor the City's decision not to

exempt Meraki from the six-resident limitation in 2019, were motivated by animus

toward those who are disabled on account of chemical dependency.

*Second*, the fact that the City created a reasonable-accommodation process in

response to Meraki's initial request actually *favored* plaintiffs.  It is true that

"[d]epartures from the normal procedural sequence . . . might afford evidence that

improper purposes are playing a role."  *Arlington Heights*, 429 U.S. at 267.  But to raise

an inference of discrimination, the "departure" would have to *disfavor* members of a

protected class.  An example of such a departure was described by the Supreme Court

in *Arlington Heights*: "if the property involved here always had been zoned [one way]

but suddenly was changed to [be zoned more restrictively] when the town learned of

[plaintiffs'] plans to erect integrated housing*." Id.*

The City's "departure" from the status quo in this case does not give rise to an

inference that "improper purposes" were at play.  The City did not change an existing

process in a way that disadvantaged disabled residents; to the contrary, it went from

having no reasonable-accommodation process to creating a reasonable-accommodation

process, and it did so because it wanted to *comply* with the FHA's protections of the

disabled.  *See* ECF No. 32-1 at 143; *id.* at 391 ("It is the policy of the City, pursuant to the

Fair Housing Act to provide reasonable accommodation in the application of its

regulations for persons with a disability seeking fair and equal access to housing. . . .

The purpose of this subdivision is to establish a process for making and acting upon

requests for reasonable accommodation.").[10]  Moreover, the procedure adopted by the

City is not suspicious in any way; in fact, it closely tracks federal law relating to

reasonable accommodations.  *Compare id.* at 392 (listing factors for City staff to consider

in evaluating a reasonable accommodation request) *with Oconomowoc Residential*

*Programs v. City of Milwaukee*, 300 F.3d 775, 783–84 (7th Cir. 2002) (identifying the

elements of a reasonable-accommodation claim under the FHA and ADA).

　　　*Finally*, a reasonable jury could not conclude on the record before the Court that

the City acted with discriminatory animus because some of the community members

who contacted the City about Meraki's request expressed discriminatory animus.  No

case holds, as plaintiffs argue, that "[d]iscriminatory statements by community

members" are sufficient—in and of themselves—to establish disparate treatment.  ECF

No. 40 at 31.  Instead, plaintiffs must introduce evidence that would allow a jury to find

a connection between the City's decision and the expressions of animus by community

_____

　　　[10]When asked about the creation of the reasonable-accommodation process,
Councilmember Geisler testified, "[T]o me, there wasn't a lot of questioning on if this
was a valuable thing for our city.  It was pretty obvious that . . . to be able to make sure
that we were consistent and how we would handle these, that we needed a
process . . . ."  ECF No. 32-4 at 18.

members.  *See City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found*., 538 U.S. 188,

195–96 (2003) (concluding that there was no evidence of intentional discrimination by

the city because plaintiffs failed to "offer evidence that the City [acted] *because of* the

referendum's discriminatory purpose" and "put forth no evidence that the private

motives that triggered the referendum drive can fairly be attributed to the [City]"

(emphasis in original) (cleaned up)); *Budnick v. Town of Carefree*, 518 F.3d 1109, 1117–18

(9th Cir. 2008) ("There is no evidence in the record to suggest that the cited comments

or similar ones . . . motivated the commissioners or Town Council members to vote

against the SUP, and we decline to make such an inference based solely on the fact that

the comments were made."); *Irshad Learning Ctr. v. Cty. of Dupage*, 937 F. Supp. 2d 910,

939 (N.D. Ill. 2013) ("There is no evidence of discriminatory statements by the Board

members or any other County officials or employees, and no other basis for the

conclusion that pressure from prejudiced community members influenced the vote.");

*see also Ass'n of Relatives & Friends of AIDS Patients (A.F.A.P.S.) v. Reguls. & Permits

Admin.*, 740 F. Supp. 95, 104 (D.P.R. 1990) ("We agree with defendants to the extent that

in the ordinary course of affairs a decisionmaker is not to be saddled with every

prejudice and misapprehension of the people he or she serves and represents.").

    The cases on which plaintiffs rely are easily distinguished.  In each of those cases,

evidence suggested that the government had acted in direct response to community

expressions of animus.  For example, in *Avenue 6E Investments, LLC v. City of Yuma, Arizona*, the court focused on the fact that the city council had taken the "highly unusual step" of "overruling the recommendations of its zoning commission and planning staff" to deny the plaintiffs' request.  818 F.3d 493, 507 (9th Cir. 2016).  The plaintiffs' request was "the only one of 76 applications considered by the City Council over the preceding three years that it had rejected."  *Id.* at 500–01.  Based on this evidence, and based on the fact that the council was "fully aware" of the local community's racially-motivated opposition, the court found that the council had acted with racial animus.  *Id.* at 507.

Similarly in *Pacific Shores Properties, LLC v. City of Newport Beach*, the court concluded that the city had acted with discriminatory intent because councilmembers had promised hostile constituents that they would reduce the number of group homes in the city.  730 F.3d at 1162–63.  "In response to criticism from residents that the Ordinance was not a blunt enough instrument to rapidly expel group homes from the City, [Councilmember] Henn urged the critics to 'judge us by our actual results.'"  *Id.* at 1163.  The court found that "*because of* pressure from citizens . . . the City Council made the ordinance narrower than outside counsel . . . had initially advised."  *Id.* (emphasis added).

Finally, in *Stewart B. McKinney Foundation, Inc. v. Town Plan & Zoning Commission of Town of Fairfield*, the court concluded that the zoning commission had "bowed to the

-17-

political pressure exerted by the residents" based on the court's finding that the commission's interpretation of its regulations was unreasonable and designed to achieve a particular, politically popular outcome. 790 F. Supp. 1197, 1212–13 (D. Conn. 1992).

In this case, by contrast, no evidence suggests that councilmembers were influenced by whatever discriminatory animus was expressed by community members. The City Council followed the recommendation of the City Planner, and there is no reason to believe that the City Planner acted with a discriminatory intent. The only direct evidence of the councilmembers' motivations is their deposition testimony in which they provide plausible, non-discriminatory reasons for their votes and in which they deny acting in response to any anti-disabled comments by community members. *See* ECF No. 32-3 at 108, 111, 171, 173, 195, 201; ECF No. 32-4 at 34; ECF No. 36 at 22–23, 46–47, 96–98, 102. For example, Councilmember Demmer explained:

> [T]hey are bringing up things that I know are not things that I should, would, or could factor in. It's just part of the job that you have to—you read them, you empathize with them, but you can't take the Not in My Backyard letters as any sort of evidence to your decision.

ECF No. 36 at 22. Similarly, Councilmember Geisler dismissed the community comments as "anecdotal" "not-in-my-backyard statements" undeserving of serious consideration. *See* ECF No. 32-4 at 34. On this record, a reasonable jury could not

conclude that the City acted *because* some community members had made discriminatory remarks in opposing Meraki's request.

Because the record would not allow a reasonable jury to find that the City acted with discriminatory intent in denying Meraki's request, the Court grants the City's motion for summary judgment on plaintiffs' disparate-treatment claim.

### D.  Disparate Impact

A prima facie case of disparate impact requires plaintiffs to show that "a facially neutral policy had a significant adverse impact on members of a protected . . . group." *Gallagher*, 619 F.3d at 833 (cleaned up).  "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact."  *Inclusive Comms.*, 576 U.S. at 543; *see also id.* at 542 (describing a "robust causality requirement"); 24 C.F.R. § 100.500(b) (listing elements required at pleading stage for "discriminatory effect" claim under FHA).

The challenged City ordinance is facially neutral; the ordinance does not distinguish between residents who are disabled and residents who are not disabled. Plaintiffs do not offer any statistical evidence that the ordinance has a disproportionate impact on disabled individuals generally or recovering substance abusers specifically. That is not surprising, given that, as plaintiffs' counsel conceded at oral argument,

Meraki's sober home is the only sober home that has ever sought an exception to the ordinance.

In short, plaintiffs have not satisfied the "robust causality requirement" necessary to prevail on their disparate-impact claim under the FHA. Accordingly, the Court grants the City's motion for summary judgment on that claim.

### E. Reasonable Accommodation

Under both the FHA and the ADA, governmental entities are required to make accommodations—including exceptions from municipal rules and policies—for individuals with disabilities "if such accommodation (1) is reasonable, and (2) necessary, (3) to afford a handicapped person the equal opportunity to use and enjoy a dwelling." *Oconomowoc*, 300 F.3d at 783; *see also* 42 U.S.C. § 3604(f)(3)(B); 42 U.S.C. § 12131(2). An accommodation is "reasonable" unless it would "impose[] undue financial or administrative burdens or require[] a fundamental alteration" of the City's policies. *Oconomowoc*, 300 F.3d at 784. An accommodation is "necessary" if, "but for the accommodation, [plaintiffs] likely will be denied an equal opportunity to enjoy the housing of their choice." *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 102 F.3d 781, 795 (6th Cir. 1996). Ensuring an "equal opportunity to enjoy the housing of their choice" means that disabled persons cannot be entirely excluded from areas that fall within particular zoning classifications—"particularly residential neighborhoods"—or

-20-

given "less opportunity to live in certain neighborhoods than people without disabilities." *Id.* (citation omitted).

### 1. Reasonable

To begin, plaintiffs' requested accommodation is clearly reasonable. The City has not provided the Court with any evidence that allowing ten residents to live in the Meraki sober home would impose undue financial or administrative burdens on the City or fundamentally alter the City's policies. *See Oconomowoc*, 300 F.3d at 785–86 (city must articulate nature and quantity of alleged burdens and may not rest on speculation). Families of *any* size who are related by blood, marriage, or adoption may share a single-family house in an LDR-2 district. *See* ECF No. 32-1 at 515, 549. The City has not explained why allowing ten *related* residents to share a single-family house in an LDR-2 district is reasonable, but allowing ten *unrelated* residents to share the same house is not reasonable. The City Planner and several councilmembers also concluded that plaintiffs' request would not impose an undue burden on the City.[11] Thus, the Court finds Meraki's request to be reasonable.

---

[11]*See, e.g.*, ECF No. 32-1 at 450 (City Planner Harlicker's recommendation to the City Council concluding that "[t]he request does not appear to constitute a fundamental alteration of the City's regulations, policies, or procedures" and "does not appear to impose an undue financial or administrative burden on the City"); ECF No. 32-3 at 173 (Councilmember Greskowiak agreeing that the request would not impose an undue financial or administrative burden on the City); *id.* at 197 (Councilmember Kiecker agreeing with Harlicker's report).

2.  Necessary

A more difficult question is whether the accommodation sought by Meraki—i.e., permission for ten residents to live at the sober house instead of six—is *necessary* to afford the residents an equal opportunity to reside in a residential district in Coon Rapids.  Several courts of appeals have already considered reasonable-accommodation claims in the context of group homes seeking variances from municipal zoning ordinances, and their analysis is informative.

First, in *Smith & Lee Associates, Inc. v. City of Taylor, Michigan*, the Sixth Circuit considered a claim brought by a for-profit adult foster care ("AFC") home operator who sought a variance from the city's zoning code to permit 12, rather than 6, unrelated persons to live together.  102 F.3d at 785.  The court identified the "equal opportunity" that the requested accommodation was meant to address as the "right [of the elderly disabled] to live in Taylor's single-family neighborhoods."  *Id.* at 795.  In concluding that the residents would not be able to avail themselves of their right to live in single-family neighborhoods without an accommodation—i.e., in concluding that the accommodation was "necessary"—the court considered the fact that the residents could no longer live alone and the fact that AFC homes were often "the *only* means by which this population can continue to live in residential neighborhoods."  *Id.* at 795–96 (emphasis added).  The court further noted that "AFC homes for the elderly disabled in

-22-

Taylor are in insufficient supply" because the city's zoning ordinance "guarantee[d] a negligible or negative rate of return for investors." *Id.* at 796. Accordingly, without an accommodation, demand for AFC homes would continue to outstrip supply, denying the residents an equal opportunity to live in residential neighborhoods. *Id.* The court emphasized that its holding was limited to the particular facts of the case. *Id.* at n.11.[12]

Next, in *Bryant Woods Inn, Inc. v. Howard County, Maryland*, the Fourth Circuit considered a for-profit group home operator's request for a variance from a county zoning ordinance to permit 15, rather than 8, residents to live together in a group home. 124 F.3d 597, 599 (4th Cir. 1997). The court rejected the claim, concluding that the accommodation sought was not necessary. It noted:

> [E]xisting zoning regulations do not prohibit group housing for individuals with handicaps. Indeed, the regulations permit such group housing. . . . The zoning variance that Bryant Woods Inn seeks is not aimed at permitting handicapped persons to live in group homes in residential communities—that, as we have noted, is already permitted—but at *expanding* its group home size from 8 to 15 persons.

*Id.* at 605 (emphasis in original). The plaintiff had not presented any evidence that group homes "are not financially viable with eight residents," and the court pointed to the existence of other group homes in the county that were operating with just eight

---

[12]The court also concluded the accommodation was reasonable because it would not "fundamentally alter the nature of single-family neighborhoods." *Smith & Lee*, 102 F.3d at 796.

residents.[13]  *Id.*  In addition, the plaintiff did not present evidence that "expansion from 8 to 15 residents would be therapeutically meaningful."  *Id.*

Finally, in *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, the Seventh Circuit evaluated a state group-home operator's request for a variance from a city rule which prohibited group homes from operating within 2,500 feet of each other.  300 F.3d at 777.  Like the Court in *Smith & Lee*, the Seventh Circuit noted:

> Often, a community-based residential facility provides the *only* means by which disabled persons can live in a residential neighborhood . . . .  When a zoning authority refuses to reasonably accommodate these small group living facilities, it denies disabled persons an equal opportunity to live in the community of their choice.

*Id.* at 784 (emphasis added).  And with respect to the plaintiffs in particular the court found:

> Janet K. and Valerie D.'s range of residential living choices is restricted by their disabilities.  Both require a living arrangement where supportive services are available twenty-four hours a day.  Janet K.'s home must be wheelchair accessible.  Neither woman could afford to purchase a home on her own.

*Id.* at 787.  The court concluded that the accommodation sought by the plaintiffs was necessary because the city's zoning ordinance "currently precludes new group homes

---

[13]"[T]he proper inquiry is not whether a particular profit-making company needs such an accommodation, but, rather do such businesses as a whole need this accommodation."  *Bryant Woods*, 124 F.3d at 605 (quotations and citation omitted).

-24-

from opening in *most* of the City of Milwaukee, thus preventing disabled adults who cannot live without some support from residing in *almost all* residential neighborhoods within the City." *Id.* (emphasis added).

Two general principles can be gleaned from these cases. First, in the context of a request for a variance from a zoning ordinance, the relevant "equal opportunity" is the opportunity for the disabled persons seeking the accommodation to live in a residential neighborhood. Second, in order for the requested accommodation to be "necessary" to achieving this equal opportunity, the plaintiffs must introduce evidence that would show that, without the accommodation, they will as a practical matter be prevented from living in a residential neighborhood.

The Court will assume, for the sake of argument, that (1) all of the residents of the Meraki sober house are disabled on account of being addicted to alcohol or drugs and (2) because of the residents' disability, the only type of home in an LDR-2 district in which they could live is a sober home, because without the therapeutic benefits of a sober home, they could not sustain their recoveries. Under these circumstances, there are at least two reasons why the City's decision to limit the number of unrelated residents in a single-family home to six might deprive these residents of the opportunity to live in an LDR-2 district. First, a sober home might not be able to provide the therapeutic benefits needed by its residents unless at least ten people live in

the home.  And second, even if a sober home could provide sufficient therapeutic benefits with fewer than ten residents, a sober home might not be financially viable—i.e., might not be able to operate *at all*—with fewer than ten residents.  Plaintiffs make both of these arguments, but plaintiffs have not submitted sufficient evidence to prove that either of these arguments is true.

First, as to therapeutic benefits:  In attacking the six-resident limitation, plaintiffs rely on anecdotal experiences (*see* ECF No. 32-1 at 478, 482, 484) and the expert report of John Curtiss (*see* ECF No. 36 at 135–45).  But the most that a jury could reasonably infer from this evidence is that a ten-resident house is preferable to a six-resident house, not that a six-resident house is incapable of providing sufficient therapeutic benefits.  For example, when plaintiff Moen addressed the City Council, he described his experience living at the sober home during the first few months it was open (when it had only six residents) and compared that experience to living in the sober home in the fall of 2019 (when it had ten residents).  Moen said that he could "personally attest to ten residents being better than six."  ECF No. 32-1 at 482.  At his deposition, Moen reiterated his opinion that a ten-resident house was better than a six-resident house:  "I guess, I mean, ten is working well . . . .  [With fewer than ten residents] it's not the same atmosphere."  *Id.* at 12.

Moen did not opine, however, that having ten residents was *essential*; in other words, he did not claim that he would be unable to live and continue his recovery in a six-person house. *See id.* at 26 ("I'm not sure [if the sober home will need to close if it doesn't receive an accommodation].  I just know that the house would be running more sufficiently [sic] . . . with ten people."); *contrast Oconomowoc*, 300 F.3d at 787 (finding that plaintiffs could not live independently and would be unable to live in a residential part of Milwaukee unless additional group homes were permitted to open).  To the contrary, Moen implicitly admitted that the sober home could successfully operate with just six residents.  As noted, Moen testified that, during the first few months that the sober home operated, it had six residents, and he did not testify that any of those six residents had any difficulty living at the home.  *See also* ECF No. 32-1 at 7 (Moen's deposition) (stating that "maybe four to six" residents lived in the sober home during the first six months that he lived there).

Krista Johnson's comments similarly failed to explain why ten residents were necessary (as opposed to preferable).  *See id.* at 478 and ECF No. 32-3 at 30 (explaining that with additional residents in the sober home, residents were less likely to ever be alone).  And Curtiss was far from unequivocal in his report:  "The therapeutic benefit of sober home living will be *less than optimal* at Meraki's sober home in Coon Rapids if it is limited to six residents."  ECF No. 36 at 139 (emphasis added).  "Less than optimal" is a

far cry from "necessary," which is what the law requires.[14]  *See Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012) (a necessary accommodation is "more than something merely helpful or conducive" but rather something "indispensable or essential," "that cannot be done without" (quotation and citation omitted)).

Second, as to financial viability:  Curtiss is unequivocal about the financial necessity of having ten residents in a sober house:  "Economically, Meraki *must* have ten residents in order to maintain the financial viability of the sober home in Coon Rapids." ECF No. 36 at 140 (emphasis in original).  But there are a number of other problems that require exclusion of Curtiss's testimony as to this opinion under Fed. R. Civ. P. 702.

As a preliminary matter, the Court doubts that Curtiss is qualified to give an expert opinion about a sober home's financial viability.  Curtiss's report states that he has extensive experience working with various organizations committed to providing treatment and services for substance abusers, including the Hazelden Foundation and the Community of Recovering People.  Curtiss also holds a Masters Degree in Human

---

[14]Further, some of the articles and studies cited in Curtiss's report in support of his opinion that a sober home needs ten residents to achieve the "optimal" therapeutic benefits recognize that as few as five individuals can make up an acceptable "interactional therapy group."  *See* ECF No. 36 at 139; *id.* at 482 ("My own experience and a consensus of the clinical literature suggest that the ideal size of an interactional therapy group is seven or eight members, with an acceptable range of five to ten members.").

and Health Services Administration, and he is a licensed counselor. ECF No. 36 at 144–45. But Curtiss does not have a business degree and does not purport to have any training or experience in accounting or finance. Thus, although Curtiss's education and experience certainly qualify him to *treat* substance abusers, they do not seem to qualify him to provide expert testimony about the financial viability of a business, even if that business relates to the treatment of substance abusers. *Cf. Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (concluding that the district court improperly admitted testimony beyond the scope of expert's expertise, even though opinion was factually related to other, proper opinions).

Putting aside Curtiss's qualifications, the only support that he gives for his opinion that Meraki "*must* have ten residents to maintain . . . financial viability" is that the sober home produces net income of $1,206.08 per month. ECF No. 36 at 140. This calculation is based on a profit-and-loss statement that covers a 20-month period from October 2018 to May 2020. *See* ECF No. 32-3 at 41. Curtis does not explain his calculations, but it appears that he arrived at the $1,206.08 figure by simply dividing the total net income listed on the profit-and-loss statement by 20, which presumably represents the 20 months that the statement covers. But this calculation is obviously flawed, as the number of residents fluctuated during this period from *none* to ten. The relevant question is whether a sober home with six residents is financially viable, and

Curtiss does not specifically address that question.  Nor does Curtiss explain why $1,206.08 per month in *net* income—i.e., the income that remains *after* paying expenses—is not sufficient to make a sober home financially viable.  Nor does Curtiss address the fact that Meraki is a business that owns multiple sober homes and sometimes uses the income from one house to cover the expenses of another.  *See* ECF 32-3 at 20 (Krista Johnson stating that net income "might transfer over and support a negative house . . . or it might be used towards the next house").

Curtiss points out that because Meraki needs to have funds available to pay for necessary expenses (such as employing a house manager, paying for supplies, and responding to repair and maintenance requests), "the number of beds is obviously crucial to . . . the financial viability of the house."  ECF No. 36 at 140.  That is no doubt true; a sober house with zero beds would not be financially viable.  But Curtis does not provide any specifics.  He does not quantify these expenses or identify the precise number of residents that are necessary to generate sufficient income to cover these expenses.

Curtiss's qualifications to testify about financial matters are so thin—and his testimony is so obviously flawed—that the Court concludes that his testimony will not "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The Court therefore excludes his financial testimony, which leaves a

jury without any basis for concluding that a sober home of six residents is not financially viable.[15]

In sum, plaintiffs' evidence is not sufficient to show that permitting ten residents to live in the sober home is *necessary* to give plaintiffs an equal opportunity to live in a residential neighborhood in Coon Rapids.  The Court therefore grants summary judgment to the City on plaintiffs' reasonable-accommodation claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

---

[15]Johnson told the City Council that "having six residents" would mean that the sober home would not be "financially stable for the residents to come out of inpatient treatment," ECF No. 32-1 at 484, and she testified at her deposition that only residents in long-term recovery would be able to live in a six-person home, *see* ECF No. 32-3 at 28, 30.  She has not, however, said that a six-person home would not be financially viable, much less provided the type of specific financial data that a jury would need to find that a six-person home was not viable.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.  Plaintiffs' motion for summary judgment [ECF No. 37] is DENIED.

2.  Defendant's motion for summary judgment [ECF No. 30] is GRANTED.

3.  Plaintiffs' complaint [ECF No. 1] is DISMISSED with prejudice and on the

    merits.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  November 29, 2021                 s/Patrick J. Schiltz
                                          Patrick J. Schiltz
                                          United States District Judge